FILED & ENTERED

JUL 23 2026

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY gonzalez  DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

# LOS ANGELES DIVISION

| | |
|---|---|
| In re: | Case No.: 2:22-bk-12904-WB |
| 626 HOSPICE, INC., | Chapter: 7 |
| Debtor(s). | Adversary No.: 2:24-ap-01108 -WB |
| HOWARD EHRENBERG, Chapter 7 Trustee, | |
| Plaintiff(s), | **MEMORANDUM OF DECISION** |
| vs. | |
| CLEO TSOLAKOGLOU WILLIAMS, an individual, | Date:        September 30, 2025<br>Time:       2:00 PM<br>Location:   255 E. Temple Street<br>            Courtroom 1375 |
| Defendant(s). | Los Angeles, CA 90012 |

## INTRODUCTION

This adversary proceeding arises in the bankruptcy case of 626 Hospice, Inc.

("Debtor"), a Medicare and Medi-Cal hospice provider whose principal, Gladwin

- 1 -

Gill ("Mr. Gill"), systematically diverted Debtor's reimbursement income over several years. Plaintiff, Howard Ehrenberg, Chapter 7 Trustee ("Trustee"), moves for summary judgment[1] against Defendant Cleo Tsolakoglou Williams ("Defendant" or "Williams") to avoid and recover $299,500 in transfers (the "Four-Year Transfers") as fraudulent transfers under 11 U.S.C. §§ 544(b), 548 and California Civil Code §§ 3439.04(a), 3439.05, 3439.07.[2]

The Four-Year Transfers were payments made to Defendant in connection with the sale of her medical practice, Asclepion Family Medical Group ("Asclepion"), to Boston Medical Center, Inc. ("BMC"), an entity controlled by Mr. Gill. The payments were not funded by the purchaser identified on the Purchase Agreement, BMC, but were funded from money that Mr. Gill and his daughter, Natasha Gill ("Natasha"), had misappropriated from Debtor's reimbursement income. Debtor received no interest in Asclepion and no value of any kind in return.

Defendant opposes the motion primarily on the grounds that she acted in good faith and provided reasonably equivalent value for the payments she received. In support of her opposition, she submitted several declarations. For the reasons set forth below, the declarations are legally insufficient to raise a genuine dispute of material fact. The undisputed record establishes that Defendant received payments from entities that had no contractual obligation to pay her, which would have placed a reasonable person in her position on inquiry notice that something

---

[1] The Trustee's motion states that this Court has jurisdiction to make recommendations to the District Court. That procedure is not necessary here, as both parties have consented to this Court's entry of a final judgment and/or order in this adversary proceeding. See Joint Status Report (docket no. 5).

[2] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, "Rule" references are to the Federal Rules of Bankruptcy Procedure, "Civil Rule" references are to the Federal Rules of Civil Procedure, "LBR" references are to the Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California ("LBR"), and "CC" references are to the California Civil Code.

was amiss. Her failure to investigate why that was the case precludes a determination of good faith. The value she provided, her Asclepion shares and goodwill, went to BMC, an entity controlled by Mr. Gill, and not to Debtor, whose funds were used to make the payments.

For the reasons set forth below, the Court determines that the Trustee has established both actual and constructive fraudulent transfers and that Defendant has failed to raise a genuine dispute of material fact as to good faith and reasonably equivalent value. The motion for summary judgment is therefore granted.

**A. Debtor and its Medicare/Medi-Cal Operations**

Debtor was formed on May 16, 2011 and entered into a Provider Agreement with the U.S. Department of Health and Human Services ("HHS") on October 28, 2014. That agreement authorized Debtor to provide hospice care services, including routine home care, continuous home care, and inpatient respite care, and to submit invoices to HHS for reimbursement. Reimbursements were administered by the National Government Services ("NGS"), an administrative contractor for HHS. Medicare reimbursements were subject to an annual year-end review to determine whether payments exceeded a cap established by the Code of Federal Regulations, and any overpayment was required to be returned upon notice from the NGS.

In May 2018, Mr. Gill, through a company he controlled and managed called American Academy of Palliative Care Services, Inc., acquired Debtor. At all times thereafter, Mr. Gill exercised control over Debtor directly or through his family members, his daughter, Natasha, who served as Debtor's Chief Financial Officer, and his wife, Amelou Gill. Debtor's primary bank account was a Citibank account (ending 4716). Medicare reimbursements were wired to that account.

**B. Gill Family Scheme**

On April 5, 2019, NGS sent Debtor its first overpayment notice, stating that Debtor received a Medicare overpayment of $149,100.09 for the year ending

September 30, 2018 and was required to return those funds. Debtor did not appeal that determination. Rather than comply, Mr. Gill and Natasha commenced a scheme to divert the overpayments. Within twenty days after this first overpayment notice, on April 25, 2019, Mr. Gill opened a Bank of America checking account (ending 1578) in the name of California Hospice ("California Hospice"), a California corporation he formed in June 2018. California Hospice had no operations, no employees, and no expenses, and it did not even have a bank account prior to April 2019. Another Bank of America account (ending 3756) was opened in the name of California Hospice on May 7, 2019.

Over the next three years, Mr. Gill and Natasha diverted 113 Medi-Cal reimbursement checks that were made payable to "626 Hospice, Inc.," totaling approximately $1.2 million, into the California Hospice accounts rather than Debtor's account (ending 4716). Medicare reimbursements that were wired directly into Debtor's account (ending 4716) were transferred out through checks payable to California Hospice and other entities controlled by the Gill family.  Mr. Gill and Natasha used the diverted funds for their own personal use and to acquire other businesses.

Additional overpayment notices followed: June 5, 2020 ($565,818.82); December 3, 2020 ($31,562.18); March 30, 2021 ($575,233.00), August 6, 2021 ($43,312.66), October 29, 2021 ($55,566.68), April 5, 2022 ($522,177.07), and a final one on June 7, 2022 ($858,644.93). Debtor repaid only a fraction of what was owed to HHS.

**C. Asclepion Sale**

Defendant was the sole owner of Asclepion, a medical practice that she operated for over 20 years.  In 2020, Mr. Gill negotiated to purchase Defendant's interest in Asclepion. On March 9, 2020, the Defendant signed a Purchase Agreement, and on April 23, 2020, Mr. Gill signed the Purchase Agreement, pursuant to which BMC agreed to purchase Defendant's 100% interest in

Asclepion and all its assets for $250,000. BMC was the sole purchaser and party obligated under the Purchase Agreement. Debtor was neither a party to, nor mentioned in, the Purchase Agreement.

On April 30, 2020, Defendant and Mr. Gill, on behalf of BMC, entered into an Addendum to Purchase Agreement ("Addendum"), and on May 4, 2020, they entered into a Share Interest Transfer Agreement, stating that the parties intended that Defendant's 100% interest in Asclepion was to be transferred to "Boston Medical Center, a California corporation." Mr. Gill never transferred any interest in Asclepion to Debtor. The Trustee does not know who currently possesses an interest in Asclepion.

Despite BMC clearly being obligated under the agreement as purchaser, Defendant received funds for the sale via checks drawn on Debtor's account (ending 4716), a check drawn from California Hospice's account (ending 3756), and a number of cashier's checks drawn from California Hospice's accounts (ending 3756 and 1578).

After completing the sale, Defendant continued to provide medical services to Asclepion. Defendant claims, through her supplemental declarations, that she entered into an Associate Medical Director Agreement with St. Francis Palliative Care, which Defendant states she was later informed was one of Debtor's DBAs, effective August 1, 2020, pursuant to which she provided part-time medical services and received compensation. The date of that agreement, the amount of compensation, and the earnings statements were provided by Defendant in her declaration and exhibits; they were not established by the Trustee. Defendant claims to have received either $15,000 or $18,000 for those services; the amount varies between her declarations, as discussed below. This discrepancy is immaterial.

//

//

**D. Bankruptcy Filing and Adversary Proceeding re The Four-Year Transfers**

On May 25, 2022 (the "Petition Date"), Debtor filed a voluntary petition under Chapter 11, which was later converted to Chapter 7. HHS filed a proof of claim, asserting that by the Petition Date, it is owed more than $2.2 million. Debtor reported no cash, no material assets, and no accounts receivable as of the Petition Date.

The Trustee commenced this adversary proceeding on May 8, 2024 by filing a complaint against Defendant. The claims for relief included the following: Claim 1: Avoidance of Four-Year Transfers as Intentionally Fraudulent Transfers pursuant to 11 U.S.C. § 544(b) and California Civil Code §§ 3439.04(a)(1) and 3439.07; Claim 2: Avoidance of Four-Year Transfers pursuant to 11 U.S.C. § 544(b) and California Civil Code §§ 3439.04(a)(2), 3439.05 and 3439.07; Claim 3: Avoidance and Recovery of Two-Year Transfers as Intentionally Fraudulent Transfers pursuant to 11 U.S.C. § 548(a)(1)(A); Claim 4: Avoidance and Recovery of Two-Year Transfers as Constructively Fraudulent Transfers pursuant to 11 U.S.C. § 548(a)(1)(B); and Claim 5: Recovery of Transfers or the Value Thereof pursuant to 11 U.S.C. § 550.  Thereafter, the Trustee filed this motion for summary judgment or in the alternative partial summary adjudication. The motion relied in part on Defendant's failure to respond to Requests for Admissions, which resulted in all requests being deemed admitted under Civil Rule 36(a)(3). The Defendant filed a motion for relief from the deemed admissions, which the Court granted. The Trustee's motion thereafter proceeded on the documentary evidence and declarations.

//
//
//
//

The Trustee seeks to avoid and recover the Four-Year Transfers, totaling $299,500, all made during the four-year period prior to the Petition Date as follows:

- **$19,000 of transfers of funds from Debtor's account (ending 4716)** – Between November 6, 2020 and May 6, 2022, 19 transfers of $1,000 each were made from Debtor's Citibank account (ending 4716) directly to Defendant. These transfers are listed in the Declaration of Steven F. Werth ("Werth Declaration") by date and amount. However, no bank statements for this account (ending 4716) were submitted. Defendant does not specifically deny or address these transfers; she does state that she was not an initial transferee of any funds from Debtor. Defendant Declaration (docket no. 27) ¶ 7.

- **$30,000 check drawn from California Hospice's account (ending 3756)** – On January 29, 2021, Mr. Gill made a check in the amount of $30,000 from the California Hospice account (ending 3756) and paid it to Defendant. The memo line on the check states "as agreed." The check does not have any reference to Debtor, 626 Hospice, Inc.

- **$250,000 of cashier's checks drawn from California Hospice's accounts (ending 1578 and 3756)** – Between March and July 2020, Mr. Gill caused five cashier checks to be drawn from California Hospice's accounts (ending 1578 and 3756) and delivered to Defendant:
  - $75,000 (March 9, 2020 from account (ending 3756), bearing the name "Nexgen Stem Cell Therapy");
  - $50,000 (April 24, 2020 from account (ending 1578), bearing the name "California Hospice Management");
  - $25,000 (May 4, 2020 from account (ending 1578) bearing the name "California Hospice Management");

- $50,000 (July 10, 2020 from account (ending 1578) bearing the name "California Hospice Mgmt"). Defendant does not deny or address this transfer; and

- $50,500 (July 20, 2020 from account (ending 1578) bearing the name "California Hospice Management Group, Ltd." Defendant does not deny or address this transfer.

The dates of the cashier's checks approximately correspond to the payment dates specified in the Purchase Agreement and Addendum. There are no references to Debtor, 626 Hospice, Inc., on the cashier's checks.

Defendant's own declarations assert that she received an additional payment of $30,000 on March 19, 2021 drawn from a BMC account (ending 0458) and that she received a total of $210,000 and is still owed $40,000 under the Purchase Agreement. These assertions appear only in Defendant's declarations and are not part of the Trustee's claims. The Court therefore does not address the BMC payment, which is outside the scope of the Four-Year Transfers as defined by the Trustee.

The Trustee has established, through bank records and the Werth Declaration, that the funds for the cashier's checks and Debtor's account (ending 4716) were traceable to the diverted HHS overpayments. Debtor received no interest in Asclepion; Mr. Gill never transferred any interest or shares in Asclepion to Debtor.

## JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This Court has authority to hear this matter pursuant to 28 U.S.C. §§ 151, 157(b)(2).

## DISCUSSION

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Civil Rule 56(a), incorporated by Rule 7056.  In assessing the summary judgment record, a court must draw all reasonable inferences in favor of the non-moving party but "[c]onclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). The non-moving party cannot simply rely on contestations of motive or intent, where those issues are contested merely by conclusory allegations or improbable inferences. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) ("If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." (internal citations omitted)); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (parties opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts").

The Trustee, as the moving party, has the burden to show that no genuine issue of material fact exists for trial, but in meeting this burden, the moving party does not need to negate the opponent's claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *In re Agric. Rsch. & Tech. Grp., Inc.*, 916 F.2d 528, 533 (9th Cir. 1990).

Defendant, as the nonmoving party, has the burden of proof on her affirmative defenses to create a triable issue. In meeting this burden, she must provide admissible evidence to create a triable issue as to her affirmative defenses of good faith and reasonably equivalent value. *In re Agric. Rsch. & Tech. Grp., Inc.*, 916 F.2d 528, 533 (9th Cir. 1990) ("Once the moving party meets this burden, the non-moving party must designate 'specific facts showing that there is a genuine issue for trial.'…In cases where the non-moving party bears the burden of proof at trial with respect to a material fact, the party opposing the motion is required 'to make a showing sufficient to establish the existence of an element essential to that

- 10 -

party's case, and on which that party will bear the burden of proof at trial.' A mere scintilla of evidence is not sufficient to withstand the motion.") (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) and *Anderson v. Liberty Lobby,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986)).

"A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact." *F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997), *as amended* (Apr. 11, 1997) (citing *Hansen v. United States,* 7 F.3d 137, 138 (9th Cir.1993) and *United States v. One Parcel of Real Property,* 904 F.2d 487, 492 n. 3 (9th Cir.1990)).

**A. Trustee's Standing Under § 544(b)**

Section 544(b) allows the trustee to step into the shoes of a creditor who could, as of the date of the bankruptcy petition, avoid the transfer under state law. *See In re Acequia, Inc.*, 34 F.3d 800, 807 (9th Cir. 1994) (a trustee's § 544(b) power is dependent on whether a creditor existed at the time the transfers were made that still had a viable claim against the debtor at the time the debtor filed bankruptcy). Thus, before invoking California's Uniform Voidable Transactions Act, the Trustee must establish the existence of an actual unsecured creditor whose claim existed at the time of the challenged transfers and who could have avoided those transfers under applicable state law.

Here, the Trustee has satisfied that requirement. The undisputed evidence establishes that HHS held unsecured claims against Debtor arising from Medicare overpayments that predated the challenged transfers. Beginning on April 5, 2019, HHS, through its administrative contractor, NGS, issued a series of overpayment determinations requiring Debtor to repay improperly received Medicare reimbursements. Additional overpayment notices followed throughout 2020, 2021, and 2022, and HHS ultimately filed a proof of claim in this bankruptcy case

- 11 -

asserting an unsecured claim exceeding $2.2 million. Those overpayment obligations arose before and during the period in which the challenged transfers were made. Accordingly, HHS was an actual unsecured creditor whose claim existed at the time of the challenged transfers and remained allowable on the Petition Date. The Trustee therefore has standing under § 544(b) to assert those state-law fraudulent transfer claims.

Having established the Trustee's standing under § 544(b), the Court turns to whether the challenged transfers are avoidable as actual and constructive fraudulent transfers under California law and the Bankruptcy Code.

**B. Actual Fraudulent Transfer**

The Trustee's first claim seeks avoidance of the Four-Year Transfers pursuant to CC § 3439.04(a)(1), made applicable through § 544(b). The Trustee's third claim seeks avoidance of those transfers occurring within two years of the Petition Date pursuant to § 548(a)(1)(A). Both claims seek avoidance of transfers made "with actual intent to hinder, delay, or defraud" a creditor of the debtor.

Because actual fraudulent intent is often established through circumstantial evidence, CC § 3439.04(b) lists eleven non-exclusive factors that courts consider in determining actual intent under CC § 3439.04(a)(1). These are referred to as "badges of fraud," which include whether Debtor retained possession or control of the property transferred after the transfer, whether the value of the consideration received by Debtor was reasonably equivalent to the value of the asset transferred, and whether Debtor was insolvent or became insolvent shortly after the transfer was made.  CC § 3439.04(b). The Trustee has the burden of proof by a preponderance of the evidence. CC § 3439.04(c).

Here, there is no genuine dispute as to the element of actual fraud. Defendant does not challenge that the transfers from Debtor were made with actual fraudulent intent. Defendant received a series of transfers from Debtor's account (ending 4716) and California Hospice accounts (ending 1578 and 3756) for the

- 12 -

purchase by BMC, owned by Mr. Gill, of Defendant's medical practice.  The Trustee has established that the money in those accounts belonged to Debtor. He has shown that Mr. Gill established the California Hospice accounts for a shell entity immediately after the first Medicare overpayment notice and that Mr. Gill and Natasha immediately began transferring Debtor's reimbursement income from Debtor's account and directly depositing Debtor's checks into the California Hospice accounts (ending 1578 and 3756).  This scheme of siphoning money away from Debtor continued for over three years with the Gill family diverting 113 checks totaling $1.2 million. This scheme was executed through multiple Gill-controlled entities and transfers to multiple accounts to try to conceal the source of the funds. The Court determines the Trustee has established that the transfers were made from Debtor to the California Hospice accounts (ending 1578 and 3756) without reasonably equivalent value and they made Debtor insolvent. Debtor received no value in exchange for the Four-Year Transfers. Further, Mr. Gill used Debtor's funds to purchase Asclepion for his company BMC.  Debtor did not receive any interest in Asclepion or any other benefit from the sale.

Furthermore, Debtor's insolvency is not genuinely disputed, and Defendant does not challenge insolvency. Defendant merely states that she did not detect that BMC, Mr. Gill, or anyone else associated with her sale of Asclepion was insolvent or likely to become insolvent. Trustee has established that Debtor became insolvent from the inception of the scheme.  Indeed, as of the time of the first overpayment notice, the Gill family began depleting Debtor's accounts while overpayment repayment obligations continued to accrue with each subsequent notice. Mr. Gill and Natasha depleted Debtor of its assets and made it impossible for Debtor to repay the overpayments. The overpayments amounted to over $2.2 million by the Petition Date, while Debtor, as reported by Natasha, had no cash, no material assets, and no accounts receivable by the Petition Date.

As a result, the Court determines the Trustee has established that the transfers of money from Debtor were made with actual intent to hinder, delay, or defraud creditors and therefore has established actual fraud.

**C. Constructive Fraudulent Transfer**

The Trustee's second claim under CC §§ 3439.04(a)(2) and 3439.05, made applicable through § 544(b), and the fourth claim under § 548(a)(1)(B), seek avoidance of constructively fraudulent transfers. A transfer may be avoided as constructively fraudulent if the transfer was made without receiving reasonably equivalent value in exchange for the transfer and Debtor was insolvent at the time or became insolvent as a result of the transfer or was engaged in or about to engage in a transaction for which the remaining assets of Debtor were unreasonably small in relation to the transaction. The Trustee bears the burden of proof by a preponderance of the evidence. CC §§ 3439.04(c) and 3439.05(b).

Here, again, there is no dispute as to insolvency. Furthermore, the Trustee has shown that Debtor did not receive reasonably equivalent value in exchange for the transfers. Debtor received nothing for the transfer of its funds to the California Hospice accounts. Nor did it receive any value for the transfer of its funds from its own accounts or the California Hospice accounts to Defendant.

As a result, the Court determines the Trustee has established that the transfers of money from Debtor were made while Debtor was insolvent or became insolvent as a result and Debtor did not receive reasonably equivalent value in exchange and therefore Trustee has established constructive fraud.

**D. Trustee may Recover from Defendant, as Defendant Failed to Show Good Faith or that She Gave Reasonably Equivalent Value for the Transfers.**

Trustee may recover the property transferred or the value of such property from the initial transferee or a subsequent transferee. 11 U.S.C. § 550(a) and CC § 3439.08(b)(1). A subsequent transferee may have a defense to recovery of the

transfer if the transferee took for value, in good faith and without knowledge of the voidability of the transfer. 11 U.S.C. § 550(b); CC § 3439.08(b)(1)(B). The burden of proving the defenses is upon the transferee, here the Defendant. CC §§ 3439.08(f)(1), (g).; *In re Agric. Rsch. & Tech. Grp., Inc.*, 916 F.2d 528, 535 (9th Cir. 1990); *In re AVI, Inc.*, 389 B.R. 721, 736 (B.A.P. 9th Cir. 2008). Whether Defendant is the initial transferee or a subsequent transferee affects her available defenses.

Here, the Trustee argues that Defendant is the initial transferee pursuant to *In re Walldesign, Inc.*, 872 F.3d 954 (9th Cir. 2017) based on the Trustee's assertion the Gills used Debtor's money for their own benefit.

In *Walldesign*, the company's principal opened a secret bank account in the debtor company's name, deposited the debtor's funds into the account, and later misdirected those funds to pay for his personal expenses without first depositing the funds into his own bank account or otherwise taking legal control of the money; the money moved from the debtor to the third parties for the principal's benefit. The unsecured creditors committee brought an adversary proceeding to recover funds from entities who were paid from the debtor's secret account for property and services provided to the principal. The defendants argued they were subsequent transferees entitled to the "safe harbor" provisions of § 550(b)(1). The Ninth Circuit held that since the money came directly from the debtor's bank account to the defendants, although orchestrated by the principal for his own benefit, the defendants were initial transferees of the payments and thus were not entitled to the statutory safe harbor provisions for subsequent transferees. *Walldesign* at 967-968.

Here, unlike in *Walldesign,* Defendant received the majority of the transfers from non-debtor accounts.  To the extent the funds were paid from non-debtor sources, the Defendant is a subsequent transferee of such funds.  The Court will now analyze each of the transfers in this context.

**1. $19,000 transfers of funds from Debtor's account (ending 4716) – Defendant as initial transferee**

The Court determines that the Trustee has established that Defendant is the initial transferee with respect to the 19 transfers of $1,000 each, from November 6, 2020 through May 6, 2022, drawn from Debtor's Citibank account (ending 4716), totaling $19,000. The checks were drawn directly from an account in Debtor's name to Defendant. The Werth Declaration identifies each transfer by date and amount. Werth Declaration ¶¶ 49-50. Defendant's declarations do not mention these transfers. She neither denies receiving them nor addresses these transfers in any way. Her declaration merely vaguely states that she was not an initial transferee of any funds from Debtor. The Court determines that the Defendant's self-serving declaration does not create a dispute of material fact.  Defendant has not controverted the testimony that the funds came from Debtor's account. Trustee has established that these transfers were made to Defendant as the initial transferee. As a result, Defendant is liable as an initial transferee for these transfers.

**2. $30,000 check drawn from California Hospice's account (ending 3756) and $250,000 of cashier's checks drawn from California Hospice's accounts (ending 1578 and 3756) – Defendant as subsequent transferee**

With respect to the other transfers, the single check in the amount of $30,000, dated January 29, 2021, drawn from California Hospice's account (ending 3756), and the five cashier's checks totaling $250,000, drawn between March and July 2020, from California Hospice's accounts (ending 1578 and 3756), bearing the names "NexGen Stem Cell Therapy" and "California Hospice Management Group, Ltd.," the Court determines that Defendant was a subsequent transferee of those funds that she received from non-debtor accounts.

Section 550(b)(1) provides a safe harbor defense for subsequent transferees:

> The trustee may not recover under section [1] (a)(2) of this section from—
>
> (1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided. 11 U.S.C. § 550(b)(1) (emphasis added).

"[T]here is no precise definition of good faith, but courts look to what the transferee objectively 'knew or should have known' rather than examining what the transferee knew from a subjective standpoint... Transferees also have a duty to investigate if there is sufficient information to put the transferee on notice that something is wrong." *In re AVI, Inc.*, 389 B.R. 721, 736 (B.A.P. 9th Cir. 2008) (internal citations omitted); *see also In re Agric. Rsch. & Tech. Grp., Inc.*, 916 F.2d 528, 535–36 (9th Cir. 1990). It is Defendant's burden to show good faith and reasonably equivalent value.

With respect to good faith, Defendant argues she had no idea the money was Debtor's money since the entities on the cashiers' checks were not Debtor. The Trustee argues that Defendant was at least on inquiry notice that something was amiss because the cashier's checks were not issued by BMC, the purchaser of her practice. The cashier's checks Defendant admits to receiving were drawn from accounts bearing the names "NexGen Stem Cell Therapy" and "California Hospice Management" or some derivative, which are entities that were not parties to the Purchase Agreement. The $30,000 check from account (ending 3756) was in the name of another entity, California Hospice, also not a party to the Purchase Agreement.

Defendant argues that the cashier's checks from NexGen Stem Cell Therapy and California Hospice Management Group, Ltd. did not have any reference to Debtor. Defendant Supplemental Declaration (docket no. 44) ¶¶ 4-8. She misunderstands; the inquiry notice was not whether the checks identified 626

- 17 -

Hospice but rather why non-buyer entities were paying for her practice when they were not purchasers of the practice.

Defendant also argues that NexGen Stem Cell Therapy could not have been involved in a Medicare/Medical fraud because it was a separate medical practice that did not do any Medicare or Medi-Cal billing but only accepted patients that paid in cash, credit card, or check. Defendant Supplemental Declaration (docket no. 44) ¶ 17. Again, Defendant misses the point. The relevant inquiry was why NexGen was funding the purchase of her medical practice, when it had no connection with the transaction.

As noted above, the Court must determine good faith, not based on the subjective understanding of the Defendant, but on an objective standard. Defendant fails to address this standard, relying simply on her contention that she had no idea that the money belonged to the Debtor. Defendant is a licensed physician who was seeking to sell her established medical practice of 20 years. The Court concludes that it was not objectively reasonable for Defendant to proceed with the transaction in good faith when the source of the vast majority of the purchase price was from entities that were not involved in the transaction. Defendant's self-serving response regarding good faith does not satisfy her burden and does not create a genuine issue of material fact. *F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997), *as amended* (Apr. 11, 1997) ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact."); *Hansen v. United States,* 7 F.3d 137, 138 (9th Cir.1993) ("When the nonmoving party relies only on its own affidavits to oppose summary judgment, it cannot rely on conclusory allegations unsupported by factual data to create an issue of material fact.").

Even if Defendant could establish good faith, the defense fails as a matter of law because Defendant has failed to establish that value was given to the transferor

in exchange for the payments. Defendant argues that she provided value to BMC because the patient list and goodwill that was transferred to BMC as part of the sale was "adequate reasonably equivalent value." Defendant Supplemental Declaration (docket no. 44) ¶ 13.  Defendant misses the point.  The inquiry is whether the transferor, here California Hospice and Next Gen, received value for the transfers. They did not.

Defendant acknowledges that she did not intend to provide value to Debtor or anyone other than Gladwin Gill and BMC stating that "primarily most of my dealings with BMC was through its principal, Gladwin Gill…at no point was the sale of my medical practice, Asclepion, intended to have any relationship to the Corporate Debtor, 626 Hospice."  Defendant Supplemental Declaration (docket no. 44) ¶ 2.

Defendant attempts to establish value by reference to payments for medical services that she provided to St. Francis Palliative Care, a hospice facility owned by Debtor and by reference to a payment of $30,000 on March 19, 2021, drawn from a BMC account.  However, these items do not establish that she gave reasonably equivalent value for the transfers at issue.  With respect to the payments for services rendered, she was paid wages by ADP, a payroll service.  This does not establish reasonably equivalent value for the transfers at issue.  Further, Defendant does not explain how the $30,000 payment from BMC constitutes value for transfers from other entities.

The Court determines that Defendant has failed to meet her burden for the safe harbor defense, as she has failed to show she took the money for value, in good faith, and without knowledge of the voidability of the transfer.[3]

---

[3] With respect to knowledge of the voidability of the transfer avoided, Defendant states in her declaration that she did not have notice concerning the voidability of the checks she received from third parties, Boston Medical, NexGen Stem, and California Hospice Management. Although Defendant makes this self-serving, conclusory statement, even if true, it does not help

In summary, the Trustee has established the Four-Year Transfers are avoidable as both actual and constructive fraudulent transfers. He is entitled to recover their value from Defendant under § 550(a). Defendant is an initial transferee as to the checks that came from Debtor's Citibank account (ending 4716). Defendant is the subsequent transferee of the check and cashier's checks from California Hospice's accounts (ending 1578 and 3756), but she failed to show any of the defenses under § 550(b)(1) are met here.

**CONCLUSION**

For the reasons stated above, Plaintiff's Motion for Summary Judgment is granted. Judgment shall be entered in favor of Plaintiff, Howard Ehrenberg, Chapter 7 Trustee, and against Defendant, Cleo Tsolakoglou Williams, in the amount of $299,500 as follows:

1. **Claim 1: Avoidance of Four-Year Transfers as Intentionally Fraudulent Transfers pursuant to 11 U.S.C. § 544(b) and California Civil Code §§ 3439.04(a)(1) and 3439.07** – all Four-Year Transfers totaling $299,500 are avoided as intentional fraudulent transfers pursuant to 11 U.S.C. § 544(b) and California Civil Code § 3439.04(a)(1).

2. **Claim 2: Avoidance of Four-Year Transfers pursuant to 11 U.S.C. § 544(b) and California Civil Code §§ 3439.04(a)(2), 3439.05 and 3439.07** – all Four-Year Transfers totaling $299,500 are avoided as constructive fraudulent transfers pursuant to 11 U.S.C. § 544(b) and California Civil Code §§ 3439.04(a)(2) and 3439.05.

3. **Claim 3: Avoidance and Recovery of Two-Year Transfers as Intentionally Fraudulent Transfers pursuant to 11 U.S.C. § 548(a)(1)(A)** – those Four-Year Transfers that occurred within two years

---

in her defense, as the "and" in the statute requires that all three elements for the defense must be shown, and Defendant has failed to show value and good faith.

prior to the Petition Date totaling $149,500 are avoided as intentional fraudulent transfers pursuant to 11 U.S.C. § 548(a)(1)(A). Those transfers are the $50,000 cashier's check dated July 10, 2020, the $50,500 cashier's check dated July 20, 2020, the $30,000 check drawn from Account (ending 3756) dated January 29, 2021, and the 19 transfers of $1,000 each from Debtor's account (ending 4716) made between November 6, 2020 and May 6, 2022, totaling $19,000.

4. **Claim 4: Avoidance and Recovery of Two-Year Transfers as Constructively Fraudulent Transfers pursuant to 11 U.S.C. § 548(a)(1)(B)** – those Four-Year Transfers that occurred within two years prior to the Petition Date totaling $149,500 are avoided as constructive fraudulent transfers pursuant to 11 U.S.C. § 548(a)(1)(B). Those transfers are the $50,000 cashier's check dated July 10, 2020, the $50,500 cashier's check dated July 20, 2020, the $30,000 check drawn from Account (ending 3756) dated January 29, 2021, and the 19 transfers of $1,000 each from Debtor's account (ending 4716) made between November 6, 2020 and May 6, 2022, totaling $19,000.

5. **Claim 5: Recovery of Transfers or the Value Thereof pursuant to 11 U.S.C. § 550** – the Trustee is entitled to recover $299,500 from Defendant pursuant to 11 U.S.C. § 550(a).

//
//
//
//
//
//
//
//

- 21 -

Judgment will be entered against Defendant, Cleo Tsolakoglou Williams, in the amount of $299,500, plus interest at the applicable post-judgment rate from the date of entry of judgment.

A separate judgment consistent with this decision will be entered.

###

Date: July 23, 2026

*Julia W Brand*

Julia W. Brand
United States Bankruptcy Judge